IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00572-MEH

MARQUISE HARRIS, and
ARTESIA CABRAL, individually and as next friend of N.C., a minor child,

       Plaintiffs,

v.

CITY AND COUNTY OF DENVER,
CITY OF AURORA,
GLENN MAHR, in his individual and official capacities,
KEVIN BARNES, in his individual and official capacities,
MIKE DIECK, in his individual and official capacities,
TASHA EWERT, in her individual and official capacities,
JEREMY JENKINS, in his individual and official capacities,
PAUL JEROTHE, in his individual and official capacities,
JON MAREK, in his individual and official capacities,
JEREMIAH MILES, in his individual and official capacities,
LARRY BLACK, in his individual and official capacities,
DAVID GROSS, in his individual and official capacities, and
TONI TRUJILLO, in her individual and official capacities,

       Defendants.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

    This action arises out of the surveillance and arrest of the Plaintiff Marquise Harris ("Harris") and law enforcement officers' entry into Harris' apartment he shared with Plaintiff Artesia Cabral ("Cabral") and their child, N.C. (collectively, "Plaintiffs") on August 17, 2017. In the operative First Amended Complaint, Plaintiffs bring three claims for relief against the various Defendants pursuant to 42 U.S.C. § 1983, as follows:

Claim 1        § 1983 Unlawful Entry and Search    All Individual Defendants

Claim 2        § 1983 Unlawful Seizure           All Individual Defendants

Claim 3          § 1983 *Monell* Claim                    City of Aurora; City and County of Denver

*See* Am. Compl., ECF No. 57. In response, Defendants City and County of Denver, Mahr, Black, Gross, and Trujillo ("Denver Defendants") filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), as did Defendants City of Aurora, Barnes, Dieck, Ewert, Jenkins, Jeroth, Marek, and Miles ("Aurora Defendants"), arguing the Plaintiffs fail to plausibly state all three claims for relief. For the reasons that follow, the Court will grant in part and deny in part the Defendants' motions.

## STATEMENT OF FACTS

The following are relevant factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by Plaintiffs in the operative First Amended Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

During the afternoon of August 17, 2017, officers assigned to the fugitive units of the Aurora Police Department ("APD") and the Denver Police Department ("DPD") conducted surveillance on the apartment of Plaintiff Marquise Harris at 1163 N. Dallas Street, Aurora, Colorado. Harris had been involved in a shooting[1] that had occurred earlier in the day in Denver. Although the shooting occurred in Denver, DPD arranged to work in conjunction with the APD's Strategic Response and Tactics ("SRT") unit to conduct surveillance and ultimately arrest Harris at or near his apartment in Aurora. DPD was in charge of the operation, and Aurora SRT assisted DPD in apprehending Harris.

Shortly before his arrest, Harris went to visit a friend in a building across from his apartment.

---

[1]Chief Deputy District Attorney Bonnie Benedetti in the Denver District Attorney's Office later declined to file charges against Harris in the matter, because she determined that Harris had acted in self-defense.

2

He was arrested by officers outside of his friend's dwelling. At the time of Harris's arrest, neither DPD nor APD had obtained a search warrant for the apartment at 1163 N. Dallas Street. Sergeant Joe Englebert of the DPD Homicide Unit informed Defendant DPD Sergeant Glenn Mahr, who was on scene outside the Plaintiffs' apartment, that the search warrant for 1163 N. Dallas Street was being prepared. Mahr told the APD officers not to enter Harris' apartment until a search warrant could be obtained. He also dispatched DPD officers to take over for the APD officers.

At no point did a judge ever sign a search warrant for the apartment. Harris told the officers as he was being arrested that they did not have his permission to enter his dwelling, noting that they did not have a search warrant to do so. Harris' son, N.C., was asleep inside the apartment at the time. Harris told the officers that he wanted N.C.'s mother, Plaintiff Artesia Cabral, or their family members who were present to get N.C. out of the apartment. Harris repeated several times that he was not giving the officers permission to enter the apartment.

Although several DPD officers were present, there was confusion among APD officers as to whether they had been ordered to enter the dwelling. The officers' discussion of the situation was partially captured on body cameras. After several APD officers gathered near the door of the apartment and knocked, another APD officer who had been speaking to a DPD officer on the phone informed them that, "They [DPD] don't want the house," and the officers retreated from the door back to the ground level of the apartment complex.

Seconds later, the APD officers walked back up the stairs to the front door. Defendant Kevin Barnes asked, "They want it again now?" Another officer remarked, "That's what one of the Denver guys just said; they want it." Barnes then commented: "Are they writing for the house or they writing for the f***ing guy? 'Cause if they ain't writing for the house then how the f***…?" Despite the confusion, an APD officer broke the apartment screen door purportedly in anticipation

of entering.

Because DPD and APD had been conducting surveillance at Plaintiffs' apartment, they knew that no other adults were inside at the time they arrested Harris. Nonetheless, at least Defendant APD Officers Barnes, Mike Dieck, Paul Jerothe, Jon Marek, and Jeremiah Miles, all heavily armed, entered Harris' apartment with guns drawn. Defendant APD Officers Tasha Ewert and Jeremy Jenkins were present at the scene and knew there was no warrant yet, but did not inform their fellow officers. In addition, several officers, including Defendant APD Officers Ewert and Jenkins, were aware that Cabral had arrived at the scene before Officers Barnes, Dieck, Jerothe, Marek, and Miles entered Plaintiffs' apartment.

As the APD officers "cleared" the apartment, they took the opportunity to closely examine the interior. Later, when allowed back into the apartment, Cabral noticed that many items were out of place. While inside, Defendant Jerothe picked up Harris and Cabral's infant son, N.C., while he was asleep, although neither Harris nor Cabral had given Jerothe permission to touch the child. Jerothe carried N.C. outside, while the other officers remained inside.

Outside, an unknown APD officer explained to Cabral, "So they're going to get a search warrant for your house. Unless you'd prefer to give them consent." Cabral stated that she would "absolutely not" give consent for the search and commented, "You guys [the APD officers] are already in there, you know, so it's already illegal." Although Sergeant Mahr and Defendants DPD Detectives Larry Black, David Gross, and Toni Trujillo were on scene and knew that no warrant had been issued, they did not clarify to APD officers that there was no warrant at the time of the entry, and did not otherwise intervene to prevent the APD officers from entering the apartment.

## LEGAL STANDARDS

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency

of the plaintiff's complaint. *Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* *Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 679. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id*. (quotation marks and citation omitted).

## ANALYSIS

As set forth in the caption of the First Amended Complaint, the Plaintiffs sue the non-entity Defendants in both their individual and official capacities. Am. Compl., ECF 57. Defendants in their individual capacities contend they are entitled to qualified immunity from Claims One and Two for violations of the Fourth Amendment.[2] The entity Defendants argue Plaintiffs fail to plausibly state Claim Three for municipal liability against them pursuant to *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 691 (1978). The Court will address each argument as presented.

## I.     Qualified Immunity

In their individual capacities, the Defendants base their request for dismissal of Plaintiffs'

---

[2]The Aurora Defendants also seek dismissal of any claims raised under the Fourteenth Amendment; however, while the Plaintiffs introduce their claims by describing Defendants' "deliberate indifference to Plaintiffs' constitutional rights under the Fourth Amendment, as applied to the states through the Fourteenth Amendment," Plaintiffs title Claim One as "42 U.S.C. § 1983 - Fourth Amendment Violation - Unlawful Entry and Search" and Claim Two as "42 U.S.C. § 1983 - Fourth Amendment Violation - Unlawful Seizure of Minor Child." Thus, the Court does not construe the Amended Complaint as alleging any Fourteenth Amendment claims.

Section 1983 claims on the doctrine of qualified immunity, which protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Because qualified immunity is an immunity from suit, rather than a mere defense to liability, it is effectively lost if a case is erroneously permitted to go to trial. *Id*. at 231; *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) ("The privilege is an immunity from suit rather than a mere defense to liability."). The "driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." *Pearson*, 555 U.S. at 231-232 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, n.2 (1987)). Accordingly, qualified immunity questions must be resolved at the earliest possible stage in litigation." *Id*. at 232.

Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. *Ahmad*, 435 F.3d at 1198 (internal quotations and citations omitted). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016) (quoting *Mullenix v. Luna*, – U.S. –, 136 S. Ct. 305, 308, 193 L. Ed.2d 255 (2015)).

When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to overcome the asserted immunity. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). Traditionally, there has been a two-step process for resolving qualified immunity questions: "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a

violation of a constitutional right. . . . Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established[3] at the time of the defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194 (2001) (internal citations and quotation marks removed)). The Supreme Court affords courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

It is undisputed that Plaintiffs' failure-to-intervene claims against the Denver Defendants cannot survive without a finding that Plaintiffs plausibly allege the Aurora Defendants' conduct violated Plaintiffs' constitutional rights. *See Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) ("In order to be liable for failure to intervene, the officers must have "observe[d] or ha[d] reason to know" of a constitutional violation and have had a "realistic opportunity to intervene.") (quoting *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008)). Therefore, the Court will analyze each claim starting with Plaintiffs' allegations against the Aurora Defendants.

A.    Claim One - Aurora Defendants

The Aurora Defendants argue for dismissal by referencing evidence outside of the Amended Complaint: the body camera recordings cited and quoted by the Plaintiffs in their allegations. Defendants contend that the Court may consider the recordings because they are referenced in the pleading and central to Plaintiffs' claims, and the Plaintiffs do not challenge the recordings' authenticity or accuracy. Citing opinions from other circuits, Plaintiffs counter that the recordings

---

[3]An official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

are not "central" to their claims, in that the allegations cite only a few quotations and references from such recordings.  Resp. 25-26.  The Court concludes that, based on the plain meaning of "central" and the Tenth Circuit's description of a document "central to the plaintiff's claim" in its seminal opinion, *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997), the body camera recordings are not central to the Plaintiffs' claims.

In *GFF Corp.*, the Tenth Circuit, citing several opinions from other circuits, concluded: "if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp.*, 130 F.3d at 1384-85.  As relevant here, Merriam-Webster defines "central" as "of primary importance; essential; principal."  *See* https://www.merriam-webster.com/dictionary/central, last visited December 10, 2019.  The Tenth Circuit found that a "letter" not attached to the operative pleading, nor incorporated by reference, was "central" to the plaintiff's claim under the following circumstances:

> . . . GFF did not dispute the authenticity of the letter. Indeed, GFF frequently referred to and quoted from the letter in its amended complaint, and alleged that the letter alone satisfied the statute of frauds. GFF also attached the letter as an exhibit to its opposition to the 12(b)(6) motion, via incorporation by reference of its 12(c) opposition, and referred to the letter (in some instances as the contract itself) throughout its brief. For these reasons, we conclude that the letter was indisputably authentic and central to GFF's breach of contract claim.

*GFF Corp.*, 130 F.3d at 1385.

In this case, the body camera recordings are not central to the Plaintiffs' claims for unlawful entry, search, and seizure; while the Plaintiffs reference and quote from the recordings in their allegations, they do so only to illustrate "confusion" among the APD officers as to whether they were authorized to enter the Plaintiffs' apartment.  Am. Compl. ¶¶ 22, 23.  However, whether the

officers were confused is not "of primary importance" or "essential" to Plaintiffs' claims; in fact, Plaintiffs neither reference nor quote from the recordings (or the related allegations) in response to the present motion. In its discretion, the Court declines the Aurora Defendants' invitation to consider the content of the body camera recordings in its analysis of the Defendants' Rule 12(b)(6) motion. *See Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999) ("We agree with our sister circuits that if a defendant attaches to a 12(b)(6) motion materials referred to by the plaintiff and central to his claim, the court has discretion to consider such materials.").

Defendants argue that it was "reasonable" for them to make a "brief entry, protective sweep, and secure delivery of the minor child to his parent" in this case and, thus, Plaintiff's first claim should be dismissed. To support this argument, Defendants rely on "facts" derived from the body camera recordings and an unpublished opinion on a motion to suppress from the Northern District of Illinois. The Court is not convinced.

The Fourth Amendment generally requires a warrant for searches and seizures within a residence; otherwise, the search or seizure is presumptively unreasonable. *United States v. Mongold*, 528 F. App'x 944, 948 (10th Cir. 2013) (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Unless an exception to the warrant requirement exists, warrantless entries are "unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within" the residence. *Id.* (quoting *Payton v. New York*, 445 U.S. 573, 588 (1980)).

The presumption of unconstitutionality for warrantless searches may be overcome by "a few 'specifically established and well-delineated exceptions.'" *Doe v. Woodard*, 912 F.3d 1278, 1290 (10th Cir.), *cert. denied sub nom. I.B. v. Woodard*, 139 S. Ct. 2616, 204 L. Ed. 2d 265 (2019) (quoting *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003)). "These exceptions

include (1) consent; (2) exigent circumstances; and (3) a 'special need.'" *Id.* Here, the Aurora Defendants do not dispute that they knew they had no warrant to enter the Plaintiffs' apartment; rather, they invoke the "exigent circumstances" exception:

> "The exigent circumstances exception allows a warrantless search when an emergency leaves police insufficient time to seek a warrant. It permits, for instance, the warrantless entry of private property when there is a need to provide urgent aid to those inside, when police are in hot pursuit of a fleeing suspect, and when police fear the imminent destruction of evidence." *Birchfield v. North Dakota*, ⸺ U.S. ⸺, 136 S. Ct. 2160, 2173, 195 L. Ed. 2d 560 (2016) (citation omitted). "Warrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) (quotations omitted) (brackets omitted).

*Woodard*, 912 F.3d at 1291 n.14.

Taking the Plaintiffs' allegations as true, the Court finds they plausibly allege Defendants Barnes, Dieck, Jerothe, Marek, and Miles entered Plaintiffs' apartment, with guns drawn and without a warrant, and searched the apartment, as evidenced by the fact that "several items were out of place," in violation of the Fourth Amendment. *See Brigham City*, 547 U.S. at 403 ("[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.") (internal quotation omitted); *see also Lundstrom v. Romero*, 616 F.3d 1108, 1129 (10th Cir. 2010) ("At the time of the alleged incidents, it was clearly established that a police officer cannot enter and search a home without a warrant and absent exigent circumstances.") (citations omitted). The allegations do not reflect exigent circumstances permitting the Defendants' entry without a warrant; while the Defendants contend that Plaintiffs allege their nineteen-month-old child was alone inside the apartment, the allegations reflect the Defendants knew, from their surveillance of the area, that no one was inside the apartment who could harm the child, and that his mother had arrived on the scene before Defendants entered the apartment. If these allegations are

true, as they must be construed for a Rule 12(b)(6) analysis, then they do not support any "urgency" necessary to invoke the exigent circumstances exception.

However, Plaintiffs' allegations that Defendants Ewert and Jenkins "were present at the scene . . . , and knew there was no warrant, yet failed to tell that fact to their fellow officers" (Am. Compl. ¶ 26) do not state a plausible failure-to-intervene claim. "[T]o be liable for failure to intervene, the officers must have 'observe[d] or ha[d] reason to know' of a constitutional violation and have had a 'realistic opportunity to intervene.'" *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (quoting *Vondrak*, 535 F.3d at 1210). While Plaintiffs' allegations, taken as true, place Ewert and Jenkins "at the scene" with knowledge "there was no warrant," they fail to demonstrate that either Ewert or Jenkins were in the presence of the APD officers or had knowledge of any constitutional violation—i.e., that the other APD officers were entering and searching the Plaintiffs' apartment.

Therefore, the Court finds Ewert and Jenkins are entitled to qualified immunity and will grant the Aurora Defendants' motion to dismiss Claim One against them. However, the remaining Aurora Defendants, Barnes, Dieck, Jerothe, Marek, and Miles, have not demonstrated they are entitled to qualified immunity with respect to Plaintiffs' first claim and, thus, the Court will deny the motion to dismiss Claim One against these Defendants.

B.    Claim One - Denver Defendants

The Denver Defendants argue the Plaintiffs fail to allege they personally participated in the alleged violation of entering and searching the apartment, as required for Section 1983 claims. The Court agrees. Personal participation is an essential allegation in a civil rights action. *See Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976). "To establish . . . liability, a plaintiff is required to bring forth evidence that an individual defendant directly and personally participated in the

purported constitutional violation." *Persaud v. Doe*, 213 F. App'x 740, 743 (10th Cir. 2007) (citing *Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1214 (10th Cir. 2003), *cert. denied*, 543 U.S. 925 (2004), *overruled on other grounds by Jones v. Bock*, 549 U.S. 199, 215 (2007)). There must be an affirmative link between the alleged constitutional violation and each defendant's participation, control or direction, or failure to supervise. *See Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993). The Tenth Circuit has noted that in a civil rights case asserting claims against individual government actors, "it is particularly important . . . that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations" against an entire group of defendants. *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). Plaintiffs do not allege that Defendants Mahr, Black, Gross, or Trujillo entered and/or searched the Plaintiffs' apartment; thus, to the extent that the Amended Complaint may be construed to allege unlawful entry and search in violation of the Fourth Amendment against these Denver Defendants, the Court finds Plaintiffs fail to state plausible claims.

Rather, Plaintiffs specifically allege that the Denver Defendants "were on the scene to oversee the surveillance and arrest of Mr. Harris" (Am. Compl. ¶ 53); Sergeant Mahr "told APD to hold off on entering Plaintiffs' apartment until a search warrant could be obtained" but "nonetheless allowed the APD officers to enter the home without a search warrant" (*id.*); and Officers "Black, Gross, and Trujillo were on scene and knew that no search warrant had been signed, yet failed to clarify to APD officers that there was no warrant at the time of the search, and failed to intervene when the APD officers entered Plaintiffs' home" (*id.* at ¶ 54). These Defendants seek dismissal arguing that the Tenth Circuit has not expanded the "failure to intervene" theory beyond excessive force cases, but even if it did, the Plaintiffs fail to allege the necessary elements.

13

The Court agrees that the Tenth Circuit has not specifically addressed a failure-to-intervene claim under the circumstances presented here, but notes that the court has found the theory cannot apply in the absence of an "unlawful seizure [of a person] or an excessive use of force." *Jones*, 809 F.3d at 576. Moreover, in *Vondrak*, the Tenth Circuit found "[i]t is 'clearly established' that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." 535 F.3d at 1210 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).[4] While *Vondrak* concerned an excessive force claim, the court did not specifically limit its citation to *Anderson* to the circumstances of that case. *See id.* Thus, the Court concludes that any failure by a law enforcement officer to intervene in a known constitutional violation by other officers was clearly established at the time of the incident alleged here.

With that said, the Court finds, for the same reasons listed above, the Plaintiffs fail to allege a plausible failure-to-intervene claim against Defendants Black, Gross, and Trujillo. Plaintiffs essentially allege the same conduct against these officers as that alleged against Ewert and Jenkins: taken as true, the allegations place Black, Gross, and Trujillo "at the scene" with knowledge "there was no warrant"; but, the allegations fail to demonstrate that Black, Gross, and/or Trujillo were in the presence of the APD officers or had knowledge of any constitutional violation—i.e., that the other APD officers were entering and searching the Plaintiffs' apartment.

Sergeant Mahr, however, is alleged to have told the APD officers to "hold off on entering

---

[4]Plaintiffs cite the same quotation from the Second Circuit's opinion in *Anderson* in an unpublished Tenth Circuit case, *Hall v. Burke*, 12 F. App'x 856, 861 (10th Cir. 2001) (Resp. 8); however, because *Vondrak* establishes the law in 2008, well before the time of the alleged incident here, the Court finds any failure to intervene in an unlawful search was clearly established.

Plaintiffs' apartment until a search warrant could be obtained," then he "allowed the APD officers to enter the home without a search warrant," which, taken as true, demonstrates Mahr's knowledge of the APD's plan and actual warrantless entrance into the apartment and his failure to stop it. The Court finds that Plaintiffs allege a plausible claim for failure to intervene against Sergeant Mahr, which was clearly established at the time of the incident.

Therefore, the Court concludes that Defendants Black, Gross, and Trujillo are entitled to qualified immunity and will grant the Defendants' motion to dismiss Claim One against them, but Defendant Mahr has not demonstrated he is entitled to qualified immunity and, thus, the Court will deny the motion to dismiss Claim One against Mahr.

> C.    <u>Claim Two - Aurora Defendants</u>

Plaintiffs allege that all individual Defendants are liable for the unlawful seizure of the Plaintiffs' child, N.C., from the residence: Jerothe for the actual physical seizure of N.C., and the other officers for failure to intervene. Specifically, Plaintiffs allege:

> 20. Plaintiff Harris explicitly told the officers as he was being arrested that they did not have his permission to enter his home, noting that they did not have a search warrant to do so.

> 21. Mr. Harris' son, N.C., was asleep inside the residence at the time. Mr. Harris told the officers that he wanted N.C.'s mother (Ms. Cabral) or their family members who were present to get N.C. out of the house. Mr. Harris repeated several times that he was not giving the officers permission to enter the residence.

> ***

> 29. Inside the home, Defendant Jerothe seized Plaintiff Harris and Plaintiff Cabral's infant son, Plaintiff N.C., while he was asleep, regardless of the fact that neither Mr. Harris nor Ms. Cabral, the child's mother, had given Officer Jerothe permission to touch the child. Defendant Jerothe carried N.C. outside, while the other officers remained inside Plaintiffs' home and continued their illegal search of the residence.

Am. Compl., ECF 57. The Court is not convinced that carrying a baby from inside a residence to

the outside where his mother was present constitutes a "seizure" under the Fourth Amendment. *See Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied.") (citations and internal quotation marks omitted). But, even if Jerothe's conduct constitutes a "seizure," the Court finds the Plaintiffs have failed to point to law clearly establishing that a law enforcement officer who carries an infant from inside a residence to the outside where the infant's mother was present violates the Fourth Amendment.

As set forth above, "[t]o overcome a government official's qualified immunity defense, a plaintiff must demonstrate (1) that the official violated a statutory or constitutional right and (2) that the law clearly establishes that right." *N.E.L. v. Douglas Cty., Colorado*, 740 F. App'x 920, 928 (10th Cir. 2018), *reh'g denied* (July 17, 2018), *cert. denied sub nom. N.E.L. v. Douglas Cty., Colo.*, 139 S. Ct. 1320, 203 L. Ed. 2d 564 (2019) (citing *Pyle v. Woods*, 874 F.3d 1257, 1262 (10th Cir. 2017)).

> The law clearly establishes a right if "existing precedent . . . place[s] the statutory or constitutional question beyond debate." *Mullenix* [*v. Luna*], 136 S.Ct. [305,] 308 [(2015)] (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 742, 131 S.Ct. 2074). A case directly on point from the Supreme Court or our circuit clearly establishes a right. *See White* [*v. Pauly*], 137 S.Ct. [548,] 551 [(2017)] (quoting *Mullenix*, 136 S.Ct. at 308). The clearly-established-law inquiry "must be undertaken in light of the specific context of the case," and isn't met by proving "a broad general proposition." *Mullenix*, 136 S.Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam)). The proffered case law "must be 'particularized' to the facts" of the instant case. *White*, 137 S.Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). And it's the plaintiff's burden to identify the relevant clearly established law. *Rios v. Riedel*, 456 F. App'x 720, 725 (10th Cir. 2012) (citing *Hilliard v. City & Cty. of Denver*, 930 F.2d 1516, 1518 (10th Cir. 1991)).

*Id.* at 929. Although the Defendants specifically argue in their motion that Plaintiffs fail to cite to clearly established law to support their claims, Plaintiffs did not respond by citing to Tenth Circuit or Supreme Court cases supporting their claim for unlawful seizure of N.C. but, rather, argue only that "no exigent circumstances [exist] to justify the Aurora Defendants' warrantless search of Plaintiffs' home or the seizure of N.C." Resp. 12-17. The Court finds Plaintiffs' argument insufficient to overcome the Defendants' entitlement to qualified immunity.

Accordingly, the Court finds Defendants Barnes, Dieck, Jerothe, Marek, Miles, Ewert, and Jenkins are entitled to qualified immunity as to Plaintiff's unlawful seizure claim and will grant Defendants' motion to dismiss Claim Two against these Defendants.

     D.     <u>Claim Two - Denver Defendants</u>

Plaintiffs also allege Denver Defendants Mahr, Black, Gross, and Trujillo failed to intervene in Jerothe's removal of N.C. from the Plaintiffs' apartment. For the same reasons set forth above, the Court finds Plaintiffs fail to demonstrate the alleged constitutional violation was clearly established in August 2017 and, thus, concludes that Defendants Mahr, Black, Gross, and Trujillo are entitled to qualified immunity. The Court will grant Defendants' motion to dismiss Claim Two against these Defendants.

**II.     Municipal Liability**[5]

Plaintiffs allege that Defendants Aurora and Denver "failed to properly train, supervise and/or discipline [their] employees with regard to lawful seizures and lawful entry into private

---

[5]The Court notes that Plaintiffs name the Defendant officers in their "official capacities" in the caption of the Amended Complaint but allege no claims against them in such capacities. A Section 1983 claim is "properly pled against a municipality either by naming the municipality itself or by naming a municipal official in his or her official capacity. Naming either is sufficient. Naming both is redundant." *Davoll v. Webb*, 943 F. Supp. 1289, 1295 (D. Colo. 1996), *aff'd*, 194 F.3d 1116 (10th Cir. 1999) (citations omitted)..

residences." Am. Compl. ¶¶ 71, 74.  A municipality can be directly sued under § 1983 when its officers commit constitutional violations in accordance with the municipality's official policy. *Ellis ex rel. Estate of Ellis v. Ogden City*, 589 F.3d 1099, 1104 (10th Cir. 2009) (citing *Monell*, 436 U.S. at 690). However, as the Tenth Circuit has acknowledged, "liability will not attach "where there was no underlying constitutional violation by any of [the municipality's] officers." *Id.* (quoting *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006)).  Thus, the Court will analyze whether the Plaintiffs state plausible claims for municipal liability against Aurora for the entry and search of the Plaintiffs' apartment by Defendants Barnes, Dieck, Jerothe, Marek, and Miles and against Denver for the alleged failure to intervene by Defendant Mahr.  Any claims for municipal liability based on the allegations supporting Claim One against Ewert, Jenkins, Black, Gross, and Trujillo and on the allegations supporting Claim Two will be dismissed.

A.     Claim Three - Aurora

Plaintiffs allege Aurora is liable for its officers' unlawful entry and search through "an informal custom amounting to a widespread practice" and/or "the failure to adequately train or supervise employees."  The Aurora Defendants assert that Plaintiffs' *Monell* claim makes only conclusory allegations and is insufficient to survive dismissal.

Again, local governments can be liable under § 1983 "only for their own illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotation and citations omitted).  To establish a § 1983 claim against a municipality, a plaintiff must "show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury" by plausibly alleging (1) the existence of a municipal policy or custom, (2) causation, and (3) state of mind. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013); *see also Monell*, 436 U.S. at 690-91, 694 ("Congress did not intend municipalities to be held liable unless

18

action pursuant to official municipal policy of some nature caused a constitutional tort.").

In establishing the first requirement, a plaintiff may show a municipal policy or custom in the form of any of the following:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions - and the basis for them - of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Brammer-Hoetler v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010)) (internal quotations omitted). "When a policy is not unconstitutional in itself, the county cannot be held liable solely on a showing of a single incident of unconstitutional activity." *Meade v. Grubbs*, 841 F.2d 1512, 1529 (10th Cir. 1988) (citation omitted); *abrogated on other grounds as recognized in Schneider*, 717 F.3d at 767. Consequently, "[w]here a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued." *Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009) (citation omitted); *see also Butler*, 992 F.2d at 1055 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under [*Monell*] unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").

For the second element, Plaintiffs must show a "direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997). Thus, to establish causation, the plaintiff must assert that the municipality's

conduct is "closely related to the ultimate injury." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989). To require anything less would subject the municipality to "vicarious liability of the type that *Monell* rejected." *Martinez v. City & Cty. of Denver*, No. 11–cv–00102–MSK, 2013 WL 5366980, at *15 (D. Colo. Sept. 25, 2013). "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider*, 717 F.3d at 770 (citation omitted).

For the third element, the Plaintiffs "have a high burden: they must 'show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.'" *Harte v. Bd. of Commissioners of Cty. of Johnson, Kansas*, 864 F.3d 1154, 1195 (10th Cir. 2017), *cert. dismissed sub nom. Bd. of Cty. Comm'rs of Johnson Cty., Kansas v. Harte*, 138 S. Ct. 576, 199 L. Ed. 2d 452 (2018) (quoting *Schneider*, 717 F.3d at 769). "To show deliberate indifference, plaintiff must allege that '[t]he need for more or different supervision . . . is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy of the City can be said to have been deliberately indifferent to the need.'" *Zartner v. City & Cty. of Denver*, 242 F. Supp. 3d 1168, 1175 (D. Colo. 2017) (quoting *Brown v. Gray*, 227 F.3d 1278, 1291–92 (10th Cir. 2000)). "[T]he need for more or better supervision . . . may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.* (citing *Vann v. City of N.Y.*, 72 F.3d 1040, 1049 (2d Cir. 1995)).

To support their municipal liability claim against Aurora, Plaintiffs allege:

32. Defendant Aurora has failed to properly train, supervise, and/or discipline any of its subordinate employees and agents who participated in the aforementioned events of August 17, 2017, despite the obvious need for scrutiny in specialized

training, supervision and discipline regarding such decisions, and the fact that its current custom, policies, or practices with respect to training, supervision, and/or discipline are clearly likely to result in a violation of constitutional rights.

33. Defendant Aurora has a longstanding, widespread, and deliberately indifferent custom, habit, practice and/or policy of condoning and ratifying unlawful entries and searches into personal homes. As a result, it has become customary among Aurora police officers to enter residences and conduct searches without a warrant, obtaining permission from residents, or the existence of exigent circumstances.

34. Because of the sheer number of Aurora officers involved in the August 17, 2017 incident involving Plaintiffs, this incident standing alone is sufficient evidence of Aurora's unconstitutional customs, policies and/or practices. Yet, other fairly recent events constitute further evidence of these unconstitutional customs, policies, and/or practices.

35. On November 21, 2018, two Aurora officers used excessive force and coercion to arrest Jamie Alberto Torres outside his house without a warrant. Responding to a noise complaint, the two officers came to Mr. Torres' residence where Mr. Torres was fixing a vehicle in his garage with the garage door open. Although Mr. Torres was in his home and acted politely toward the officers, the police officers took advantage that he spoke very little English and threatened him with arrest if he did not come out of the garage. Mr. Torres complied with the order without resistance and the officers seized Mr. Torres and slammed his face into the ground.

36. On June 23, 2016, responding to a mistaken dispatch that there were drunk adults near children, multiple police officers arrived at Kevin Ravenscroft's residence where he was inside hanging out with a few friends. One officer entered Mr. Ravenscroft's garage without his permission, falsely told Mr. Ravenscroft that he had a warrant, and threw him to the ground as the other officers unlawfully searched his home. They found no evidence to indicate the law was broken.

37. On November 14, 2015, two Aurora officers ordered Dwight Crews, a 60-year-old, disabled African-American man, out of his home under threat of force, despite the fact that the officers had no warrant and no exceptions to the warrant requirement justified a warrantless arrest in the home.

38. On March 23, 2008, multiple Aurora police officers unlawfully entered the home of, and tased, Duane Williams, an African-American man. The officers had been called to Mr. Williams' home for a disturbance. Upon arrival, they unlawfully entered Mr. Williams' home without permission and ordered him to the ground. When Mr. Williams questioned why the officers were in his garage, they tased him. Aurora police tased Mr. Williams multiple times, hit him with batons, and placed him in a choke hold. Mr. Williams suffered a compound fracture to his leg that required the insertion of a permanent metal rod and screws.

Am. Compl., ECF 57.  The Court finds these allegations fail to demonstrate an informal policy, custom, or practice that is "widespread" such that, "although not authorized by written law or express municipal policy, [it] is so permanent and well settled as to constitute a custom or usage with the force of law."   First, the fact that five Aurora police officers entered the Plaintiffs' apartment is not sufficient to reflect a "widespread" practice, and the Plaintiffs fail to cite persuasive law supporting this contention.   Second, some of the examples of "similar" events proffered by the Plaintiffs are not sufficiently similar; neither the November 21, 2018 incident nor the November 14, 2015 incident involve entries and searches of a residence "without a warrant, obtaining permission from residents, or the existence of exigent circumstances." Am. Compl. ¶ 33.  Thus, the only examples taken as true and applicable here are the June 23, 2016 incident and the March 23, 2008 incident, which occurred more than nine years before the entry and search challenged here.  The Court finds these are insufficient to allege a plausible "informal custom" necessary for a municipal liability claim.

Plaintiffs also contend their allegations state Aurora's failure "to properly train, supervise, and/or discipline any of its subordinate employees and agents who participated in the aforementioned events of August 17, 2017," including Defendants Barnes, Dieck, Jerothe, Marek, and Miles.  As set forth above, a claim alleging failure to train or supervise requires the application of "rigorous standards of culpability and causation . . . to ensure that the municipality is not held liable solely for the actions of its employee." *Schneider*, 717 F.3d at 770.  The Court finds Plaintiffs' allegations fail to plausibly state both causation and culpability.

First, the allegations fail to show that Aurora's failure to train or supervise is "closely related" to the officers' entry and search of the Plaintiffs' apartment.  Again, the fact that five officers entered and searched the apartment is not sufficient to establish the required link; the Court

takes judicial notice[6] that the city's population exceeded 350,000 in 2017, and Aurora is currently the third largest city in Colorado. *See* https://www.auroragov.org/city_hall/about_aurora/data___ demographics/population, last visited December 11, 2019. Furthermore, the two similar incidents in 2016 and 2008 are not sufficient to demonstrate a "close relation" between any failure to train or supervise and the alleged unlawful entry and search.

With respect to the culpability element, Plaintiffs argue that the fact (taken as true) that the officers received no discipline for their conduct demonstrates the existence of a custom and Aurora's deliberate indifference to its citizens. Resp. 20-23. However, it appears that the law permits an inference of deliberate indifference if officers received no discipline for "repeated" complaints of civil rights violations. *See Zartner*, 242 F. Supp. 3d at 1175 ("[T]he need for more or better supervision . . . may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.") (citing *Vann v. City of N.Y.*, 72 F.3d 1040, 1049 (2d Cir. 1995)). "To show deliberate indifference, plaintiff must allege that '[t]he need for more or different supervision . . . is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy of the City can be said to have been deliberately indifferent to the need.'" *Id.* Here, again, the Court finds the allegations are insufficient to show "repeated" complaints of unlawful entry and search.

Finally, to the extent the Amended Complaint may be construed as alleging a "single incident of unconstitutional activity," the Plaintiffs fail to allege the entry and search were conducted "pursuant to a decision made by a person with authority to make policy decisions on behalf of the

---

[6]A court may consider "matters of which a court may take judicial notice" in a Rule 12(b)6) analysis. *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013).

entity being sued." *See Moss*, 559 F.3d at 1169.

The Court concludes that Plaintiffs fail to allege plausible claims for municipal liability against the City of Aurora and will grant the Aurora Defendants' motion to dismiss Claim Three.

B.      Claim Three - Denver

Plaintiffs' arguments are essentially the same in asserting that they plausibly allege municipal liability claims against the City and County of Denver in the forms of an "informal custom or practice" and a "failure to train, supervise and/or discipline." The Court is not convinced.

First, the fact that one officer, Sergeant Mahr, failed to intervene in the warrantless entry and search is insufficient to demonstrate a "widespread" informal custom. Second, the examples of a warrantless entry and excessive force in 2009 and the Office of the Independent Monitor's reports in 2008 and 2009 addressing the "alarming frequency of unlawful warrantless entries into private residences" are too attenuated from the August 2017 incident to establish a custom or practice so "permanent and well settled as to constitute a custom or usage with the force of law." Likewise, these 2008 and 2009 incidents fail to demonstrate a "close relation" between any failure to train or supervise and Sergeant Mahr's failure to intervene.

Moreover, even taking the allegation as true, the "2017 OIM Annual Report" reflecting that "the most common internal and community complaints" occurred "in the category called, 'Duty to Obey Department Rules and Mayoral Executive Orders,' which include[d] unconstitutional search and seizure," is too vague to support a finding of an informal custom or to demonstrate any failure to train, supervise, and/or discipline Sergeant Mahr; the allegation fails to reveal the content and number of complaints, the scope of the category itself, and how much of it included Fourth Amendment claims.

Finally, to the extent the Amended Complaint may be construed as alleging a "single incident

of unconstitutional activity," the Plaintiffs fail to allege Mahr's failure to intervene occurred "pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued." *See Moss*, 559 F.3d at 1169.

The Court concludes that Plaintiffs fail to allege plausible claims for municipal liability against the City and County of Denver and will grant the Denver Defendants' motion to dismiss Claim Three.

## CONCLUSION

The Court concludes that Defendants Ewert, Jenkins, Black, Gross, and Trujillo enjoy qualified immunity with respect to the claims alleged against them in their individual capacities and, therefore, the Court will dismiss Claims One and Two against these Defendants. In addition, Defendants Mahr, Barnes, Dieck, Jerothe, Marek, and Miles enjoy qualified immunity with respect to Plaintiffs' second claim and, thus, the Court will dismiss Claim Two against these Defendants. Finally, Plaintiffs have failed to allege plausible claims of municipal liability against the City of Aurora and the City and County of Denver, and the Court will dismiss Claim Three. Remaining in this case is Claim One against Defendants Barnes, Dieck, Jerothe, Marek, and Miles for unlawful entry and search and against Defendant Mahr for failure to intervene to prevent or stop the unlawful entry and search.

Accordingly, the Motion to Dismiss First Amended Complaint by Defendants Denver, Mahr, Black, Gross, and Trujillo [filed July 18, 2019; ECF 58] and the Aurora Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [filed July 19, 2019; ECF 62] are **granted in part and denied in part** as set forth herein.

In light of this order, the temporary stay is **lifted**. The Court will hold a Status Conference on **January 13, 2020 at 11:15 a.m.** in Courtroom A-501, on the fifth floor of the Alfred A. Arraj

United States Courthouse located at 901 19th Street, Denver, Colorado. Counsel for the parties shall be prepared to discuss scheduling discovery in this case.

SO ORDERED.

Dated this the 17th day of December, 2019, in Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge