IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00572-MEH

MARQUISE HARRIS,
ARTESIA CABRAL, and
N.C., a minor child through next friend, Artesia Cabral,

      Plaintiffs,

v.

SERGEANT KEVIN BARNES,
OFFICER MIKE DIECK,
OFFICER PAUL JEROTHE,
OFFICER JON MAREK, and
OFFICER JEREMIAH MILES,

      Defendants.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

      Before the Court is Defendants' Motion for Summary Judgment. ECF 136. The matter is fully briefed, and the Court finds that oral arguments will not materially assist in its adjudication. For the following reasons and based on the submitted record, the Motion is granted.

## BACKGROUND

### I.    Claims for Relief

      Defendants are police officers for the City of Aurora, Colorado, and its police department ("APD"). They belong to a special team that executes high-risk arrest warrants. A separate law enforcement agency, the Denver Police Department ("DPD"), requested the team's assistance in surveilling Plaintiffs' residence and arresting Plaintiff Marquise Harris. Both the residence and

1

Harris were located in Aurora, but DPD was acting on an outstanding arrest warrant for the charge of first-degree murder regarding a shooting that had occurred in Denver earlier that day. Harris was considered armed and dangerous. APD sent two teams. One was deployed to help arrest Harris, and the second was there to set up a containment perimeter. The arrest team apprehended Harris after he had stepped outside his home. The perimeter team entered the residence to secure it until a search warrant was obtained as well as to remove Plaintiff N.C., the nineteen-month-old infant child of Harris and Plaintiff Artesia Cabral, who was inside alone. Upon entering Plaintiffs' apartment, Defendants also conducted a protective sweep.

Defendants are members of the APD perimeter team, and Plaintiffs are suing them for the alleged unlawful entry and search of their home without a warrant in violation of their Fourth Amendment rights. Plaintiffs may not claim a violation of their Fourteenth Amendment rights based on the same facts and legal arguments. *Shimomura v. Carlson*, 811 F.3d 349, 361 (10th Cir. 2015).

## II.    Procedural History

Plaintiffs initially had sued additional APD officers and the City of Aurora as well as DPD police officers and the City and County of Denver. Collectively, all of the then-named Defendants moved to dismiss Plaintiffs' First Amended Complaint ("FAC"). The Court granted their two motions to dismiss in full except for DPD Defendant Glenn Mahr (against whom Plaintiffs raised a failing-to-intervene claim) and APD Defendants Barnes, Dieck, Jerothe, Marek, and Miles (with respect to the warrantless entry claim). *Harris v. Denver*, No. 19-cv-00572-MEH, 2019 WL 6876870 (D. Colo. Dec. 17, 2019). Defendant Mahr was the only litigant who appealed the dismissal order. The Tenth Circuit reversed the denial of qualified immunity as to him. *Harris v. Mahr*, 838 F. App'x 339 (10th Cir. 2020).

In the underlying dismissal ruling, this Court did not find APD Defendants Barnes, Dieck, Jerothe, Marek, and Miles entitled to qualified immunity because their argument relied on evidence outside the scope of the FAC, namely, officers' body camera recordings. *Harris*, 2019 WL 6876870 at *4-5. Instead, the Court limited its consideration to the FAC and accepted as true the allegations that "Defendants knew, from their surveillance of the area, that no one was inside the apartment who could harm the child, and that his mother [Cabral] had arrived on the scene before Defendants entered the apartment." *Id*. at *6. Those allegations, this Court concluded, "do not reflect exigent circumstances permitting the Defendants' entry without a warrant." *Id*. In other words, the allegations "do not support any 'urgency' necessary to invoke the exigent circumstances exception." *Id*.

With the instant summary judgment motion, the APD Defendants, who remain party to this lawsuit, argue again for qualified immunity protection.

### III.    Stipulation

The parties submit a "Stipulation" of sorts derived from testimony and other evidence and meant to be used as a statement of what happened for purposes of briefing the qualified immunity dispute. Plaintiffs expressly limit the Stipulation's applicability to the present summary judgment motion only. In addition, Plaintiffs concede only that it reflects anticipated testimony; they do not regard it as an assertion of objective facts. ECF 141 at 2. The Court recites the Stipulation below, making stylistic changes and noting points that may remain in dispute.

1)      In the early morning hours of August 17, 2017, Plaintiff Marquise Harris was involved in a shooting that occurred in the City and County of Denver.

2)      Having obtained a warrant for Harris's arrest, DPD requested assistance from APD's Strategic Response and Tactics Unit ("SRT") and Aurora's Fugitive Apprehension and

Surveillance Team ("FAST"), to conduct surveillance on Plaintiffs' residence on N. Dallas Street in Aurora and to assist in the apprehension and arrest of Harris.

3)      At times, Aurora SRT is called to provide assistance to outside agencies.

4)      Aurora SRT was notified by FAST that Denver's Fugitive Unit had positively identified Harris, who had an active warrant for murder in the first degree.

5)      Aurora SRT is called to assist with high-risk arrest warrants primarily involving gangs, fugitives, narcotics, and violent crimes.

6)      On August 17, 2017, Denver's Fugitive Unit conducted surveillance on Plaintiffs' home.

7)      Aurora SRT officers did not know how long the Denver Fugitive Unit had been "sitting on" the residence.

8)      Two Aurora SRT teams were deployed to assist Denver's Fugitive Unit. Sgt. Holm led the team in charge of Harris's arrest, and he was first on the scene, thereby making him the primary supervisor from Aurora. The second team, led by Defendant Sgt. Barnes, set up on the perimeter to assist with containment.

9)      Defendant Officers Miles, Marek, Jerothe, and Dieck were in the SRT "perimeter team" led by Sgt. Barnes. They did not participate in the ultimate arrest of Harris.

10)     As Aurora's SRT teams were in route, officers from the Denver Fugitive Unit, who already were on scene, advised they had observed Harris going in and out of the N. Dallas Street address.

11)     Aurora SRT officers also learned from FAST and the Denver Fugitive Unit that a small child was at the address.

12)     The Aurora SRT teams were further advised that Harris was considered armed and dangerous with a criminal history including but not limited to assault with a deadly weapon,

aggravated robbery, felony menacing, possession of a weapon by a previous offender, and burglary.

13)     At approximately 12:30 p.m. a Hispanic female, Cabral, was observed exiting the residence by herself and getting into a Ford Expedition.

14)     Given tactical and safety considerations related to the small child, Sgt. Holm of Aurora's SRT team devised a plan to try to take Harris into custody once Harris was outside the apartment.

15)     Upon arriving at the scene, Aurora SRT officers were advised that Harris had exited the apartment and was seen walking across the alley to a neighboring residence.

16)     At approximately 1:25 p.m., as Harris was at the door to the neighbor's home, the Aurora SRT arrest team (led by Sgt. Holm), made contact and arrested Harris without incident.

17)     As Plaintiffs' residence was being surveilled and insofar as Harris did not have the small child with him when he was arrested and taken into custody, the small child was presumed to be inside Plaintiffs' residence. However, officers did not know where the small child was in the apartment.

18)     As Harris was apprehended, he advised the arrest team that his baby was in the residence. (Body Camera Recording of Officer Jeremy Jenkins (Ex. A)).

19)     Specifically, Harris stated (citing the time stamps of the recording at Ex. A:

         a) "What are they doing? My baby's in there." (13:26:51);

         b) "My baby's in the house." (13:27:50);

         c) "Ya'll don't have no search warrant to go in my house, my baby, he's sleeping. My wife, and my baby, you guys don't have no search warrant." (13:27:56);

         d) "My baby's asleep" (13:27:59);

e) "Hey Mr. [inaudible] can you call Mookie (Cabral) and tell her to come over here because the baby's in the house." (13:28:07);

f) "Well, I'm saying my baby's in there." (13:28:54);

g) "I just want my baby out the house." (13:29:05);

h) "I just want my baby out, uh, uh, right here with the people that you with …" (13:29:23);

i) "The back door is open." (13:29:40);

j) "There are no search warrants or nothing for my house." (13:30:00).

20)     Officers from the Denver Fugitive Unit advised the Aurora SRT teams that a search warrant was imminent or pending and a Denver police officer (Sgt. Mahr) requested, before leaving the scene, that Aurora SRT officers conduct a protective sweep of Plaintiffs' residence and to secure the residence for a search warrant. The Aurora officers understood that Denver would hold the apartment for the search warrant.

21)     Aurora SRT officers, not assigned to the arrest team, moved toward the apartment to conduct the protective sweep.

22)     Sgt. Barnes believed a protective sweep was warranted because Aurora SRT officers relied in good faith on the supervising officers from Denver that a search warrant of the residence was imminent; they were also aware that Harris was wanted for first-degree murder; because they knew a small child was inside the residence and possibly alone, in addition to the possibility that other individuals were inside the home (in part because Harris had been seen leaving the apartment and returning leading to the possibility someone else was watching the small child)[1]; because they

---

[1] This Stipulation states that Sgt. Barnes "believed" "the possibility that other individuals were inside the home." Even if Sgt. Barnes personally perceived that possibility, the standard asks whether he had an objectively reasonably basis for entering the apartment and conducting the sweep. The Stipulation leaves open whether it was reasonable for Defendants to suspect the presence of others inside the home and whether the available facts created a reasonable

were also aware of Harris' proximity to the residence when he was arrested; and to ensure that there were not any unknown threats to Denver officers who were going to be conducting the search of the apartment when Denver secured the search warrant.

23)     Defendants had no reason to believe the baby was in danger or distressed; nor did they have reason to believe the baby was not in danger or was not in distress. However, they would not have left the baby alone and unattended without making sure the baby was not in danger or in distress while awaiting the warrant.

24)     Denver officers advised the Aurora SRT teams, including Defendants, that Denver "wanted" the residence. While the Aurora SRT "perimeter" team was "in the stack," just before making entry into the residence to conduct the protective sweep, they were told that Denver did not "want" the apartment.

25)     Accordingly, the Aurora SRT team withdrew from the doorway and began walking away. When Denver advised they did not "want" the apartment, there was no need for the protective sweep.

26)     Shortly thereafter, the Aurora SRT team, including Defendants, was advised that Denver did "want" the apartment. The Aurora SRT team was once again asked to conduct a protective sweep.

27)     As it relates to Aurora's SRT and FAST Units, and Denver's Fugitive Unit, the term "want" is commonly used to refer to the fact that either a warrant had been issued or a warrant was being written.

---

justification for conducting the sweep.

28)     When Denver advised that they "wanted" the residence, Aurora officers understood that Denver either had a warrant for Plaintiffs' residence or were writing a warrant for Plaintiffs' residence.

29)     Specifically, the following exchange occurred (citing to the time stamps of the Body Camera Recordings of Sgt. Kevin Barnes (Ex. B); Jeremiah Miles (Ex. F); and Jon Marek (Ex. E (2))**,** as indicated):

   a) "They don't want the house?" (Ex. B. at 13:28:10);

   b) "They don't want the house" (on the phone talking to a detective), "they don't want the house." (Ex. F at 13:28:05);

   c) "Denver just told us they don't want the house, but they want the SUV." (Ex. F at 13:28:16);

   d) "They don't want the house, guys." (Ex. B at 13:28:19);

   e) "They want it again now?" (Ex. B at 13:28:35; Ex. F at 13:28:36);

   f) "Do they want the house, then?" (Ex. B at 13:28:56; Ex. E (2) at 13:28:50);

   g) "That's what one of the Denver guys just said, they want it." (Ex. B at 13:28:59; Ex. E (2) at 13:28:52);

   h) "Are they writing for the house or are they writing for the guy?" (Ex. B at 13:29:02; Ex. E (2) at 13:28:56).

   i) "So they definitely want this thing?" (Ex. B at 13:29:30).

30)     After exiting Plaintiffs' residence, Sgt. Barnes stated, "I don't think they wrote for the warrant [sic], I thought they wrote for the guy—they—was getting a warrant for the dude… I'm pretty that's what they were saying." (Ex. B at 13:34:00).

31)     In earlier radio traffic, Sgt. Barnes thought Denver was writing a warrant for Harris, but before going into the house, he confirmed that Denver also was writing a warrant for the house and that Denver needed a protective sweep.

32)     Before making entry, Sgt. Barnes confirmed with Denver—one more time—that Denver "wanted" the residence.[2] Had Denver not confirmed the same, Sgt. Barnes would not have allowed his team to enter and sweep the residence.

33)     None of the Defendants, who were all on the Aurora SRT perimeter team set to make entry into the apartment to do the protective sweep, had any contact with Harris.

34)     Defendants made entry into Plaintiffs' residence to conduct a "protective sweep." (Exs. B, C, D, E (3), & F).

35)     Generally, a protective sweep entails entering a residence and looking for possible hidden threats who would pose a danger to officer safety—looking for places where a person could hide— it is not a search for evidentiary items.

36)     Radio communications first indicate that Cabral was driving up to the location and officers were attempting to have a vehicle intercept and contact her. (Ex. A at 13:31:58).

37)     Cabral arrived on scene[3] and asked to enter the residence to get her baby. None of the Defendants spoke with Cabral, and at the time entry was made into Plaintiffs' residence (to conduct

---

[2] It is possible, Plaintiffs argue, that the factfinder might disbelieve Sgt. Barnes' explanation that the Defendants acted on the basis of an anticipated search warrant when they entered the home. ECF 141 at 5.

[3] The parties do not dispute that Cabral had left by herself around 12:30 p.m. (Stipulation No. 13) or that she returned *around* the time of Defendants' entry into her apartment. However, the parties do not stipulate as to *exactly* when Cabral had returned and was present at the scene. In their Reply, Defendants represent as undisputed that Cabral arrived on scene at 13:32:30 when they already were inside the home. ECF 144 at 6.

a protective sweep), Defendants were not aware[4] of Plaintiff Cabral's whereabouts. Cabral was told she was not permitted to go inside to get her baby. She was told that law enforcement was getting a search warrant for her house. Based on information from Denver, Defendants understood that a search warrant was pending and that they had been asked to do protective sweep. Under those circumstances, Cabral would not have been allowed to go inside to get the baby. Defendants entered the apartment and checked to make sure nobody else was inside, and Defendant Jerothe got the baby and brought the baby to Cabral. (Body Camera Recording of Officer Ewart (Ex. G) at 13:35:44-13:36:48; Ex. A at 13:35:35-13:36:37 and 13:39:04)**.**

38)    At the time when Defendants conducted the protective sweep, they knew that Harris had been apprehended outside Plaintiffs' residence, either in the alley or across the alley in front of a neighbor's residence.

39)    Defendants entered Plaintiffs' residence, recovered the child, and cleared the rest of the residence to ensure there was no one else inside because they had not ruled out the possibility there could be dangers inside.

40)    Based on their training and experience, Defendants believed under the circumstances and given the variables (*see generally* Stipulation No. 22 above), a protective sweep was warranted.

---

[4] Plaintiffs cite to the evidentiary record which they say shows either that Defendants *could* have learned about Cabral's whereabouts and anticipated return time to the apartment or *should* have been aware of that information before they entered the home. Taking it one step further, Plaintiffs also contend that Defendants actually and personally *did* know that information at that time, *before* entering the home. ECF 141 at 5. However, Plaintiffs note that "Defendants have or will (based on the "stipulations" in their motion for summary judgment) apparently deny knowing that Ms. Cabral was readily available to enter her home to obtain the baby inside before the entry." ECF 141 at 5.

41)     Although Aurora SRT officers did not have information that another adult had been seen inside the apartment, they did not know if an adult was inside, and the fact that Harris had been seen going in and out without the child suggested another person might be inside.[5]

42)     Aurora officers, including Defendants were wearing body cameras which recorded the events related to the arrest and entry into the Plaintiffs' apartment. (The parties submit the body worn cameras belonging to Jenkins, Barnes, Dieck, Jerothe, Marek (1)(2)(3), Miles, and Ewart (Exs. A-G)).

43)     Defendants entered the residence at approximately 1:31 p.m. (Exs. B, C, E(3) and F).

44)     Defendant Jerothe was in the apartment for approximately one minute, clearing a closet, and then removing Plaintiff minor child N.C. (Body Camera Recording of Officer Paul Jerothe (Ex. D) at 13:31:48 - 13:32:48).

45)     Upon exiting the apartment, Defendant Jerothe immediately walked over and handed Plaintiff N.C. to his mother, Plaintiff Cabral. (Ex. D at 13:32:56-13:33:31).

46)     After bringing Plaintiff N.C. to Plaintiff Cabral, Officer Jerothe did not return to the residence. (Ex. D).

47      Defendants Barnes, Dieck, Marek, and Miles were in Plaintiffs' apartment for approximately two minutes. (Ex. B; Body Camera Recording of Officer Mike Dieck (Ex. C); Body Camera Recording of Officer Jon Marek (Ex. E (3)); Ex. F at 13:31:48-13:33:46).

48)     During the approximately two minutes that Defendants Barnes, Dieck, Marek, and Miles were in the Plaintiffs' residence, no items or evidence were retrieved or seized, and instead

---

[5] The Court discusses in the below legal discussion whether this belief was objectively reasonable and whether the available facts created a reasonable justification for conducting the sweep.

11

they only looked in places where a person could hide. (Exs. B, C, D E (3) & F at 13:31:48-13:33:46).

49)     Each of the Defendants acted in accordance with their training.

50)     Defendants left the scene, and Denver officers held the apartment, keeping it secure, while the warrant was being written.

51)     Harris later gave consent to Denver officers to retrieve the clothing Harris was wearing at the time of the shooting.

Defendants summarize the above Stipulation as showing it to be undisputed that: (1) they entered Plaintiffs' home to retrieve the small child, N.C., *and* to conduct a protective sweep of the residence to secure it for a search warrant; (2) they understood a search warrant was imminent or pending; and (3) Denver law enforcement officers would hold the apartment until the search warrant was obtained. ECF 144 at 7. It is unclear the extent to which the parties believe that the Stipulation supports Defendants' argument that they were reasonably justified in conducting the sweep because they acted on a reasonable suspicion that there might be a source of danger. Defendants rely on Sgt. Barnes' statement about what he believed (Stipulation No. 22), other reasons for suspecting the presence of someone else inside (Stipulation No. 41), and Ex. B at time stamp 13:27:21 when Sgt. Barnes' stated at the scene "—says somebody else was inside talking to [Harris]" before Defendants made entry (ECF 144 at 6).

## IV.     Additional Undisputed Material Facts

In addition to the above Stipulation, Plaintiffs assert in their Response additional material facts. ECF 141 at 2-6. Below are those facts for which Plaintiffs provide citations to the underlying record, are not conjecture or speculative, are consistent with the Stipulation, are otherwise

undisputed, and material to the qualified immunity dispute. To the extent they contain legal argument, the Court takes them into consideration as such in the later Discussion section.

52)     Also addressed at Stipulation No. 45 above, the record shows that Defendant Jerothe exited Plaintiffs' apartment with N.C. in his arms. An officer tells him that "the baby's mom is over here," and in response, Defendant Jerothe says, "okay." He then asks, "can we give her to mom?" Ex. D at 13:32:58-13:33:00.

53)     Also addressed at Stipulation No. 37 above, the body camera video of Officer Jenkins (who no longer is a Defendant) indicates that some officers at the scene knew that Cabral was en route and that Cabral had returned either when the Defendants already were in their stack formation about to enter the apartment or already had entered it. Ex. A, Ex. 1.

54)     Plaintiffs elaborate on Stipulation No. 42 about Defendants' actions (other than Jerothe) while inside the apartment. Sgt. Barnes looked around the living room, kitchen, hallway, and bathroom. Officer Dieck looked around the kitchen, hallway, living room, bedroom, and bedroom closet. Officer Marek looked around the kitchen, living room, hallway, playroom, and kitchen closet. Officer Miles looked around the kitchen, hallway, living room bedroom, and bedroom closet.

55)     Defendants did not enter the home in "hot pursuit" of a suspect.

56)     When Defendants entered the home, no search warrant had been obtained yet, nor was a search warrant ever actually obtained, even after the entry.

## **LEGAL STANDARDS**

### I.     **Fed. R. Civ. P. 56(c)**

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary

judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).

"[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v.*

*Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## II.    Qualified Immunity

Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly violative at the time of the official's actions. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It "protects all but the plainly incompetent or those who knowingly violate the law." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). The privilege is an entitlement not to stand trial or face the other burdens of litigation, and thus, it is immunity from being sued rather than a defense to liability. *Ahmed v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006). Qualified immunity exists if (1) the law enforcement officer's actions violated a constitutional or statutory right and (2) the right was clearly established at the time of the officer's conduct. *Harris*, 838 F. App'x at 342.

When a defendant asserts qualified immunity at the summary judgment stage, it is the plaintiff who bears the burden of showing both (1) the defendant violated a constitutional right and (2) that constitutional right—or stated differently, the unlawfulness of the defendant's conduct— was clearly established at the time. *Smith v. City of Hobbs*, No. 19-cv-00796-JCH-SMV, 2020 WL 7056102, at *4 (D.N.M. Dec. 2, 2020) (citing case law). In determining whether a plaintiff meets this burden, the court accepts the plaintiff's version of the facts as true, unless blatantly contradicted by the record so that no reasonable jury could believe it. If the plaintiff meets the two-part test, then the defendant bears the traditional burden of the movant for summary judgment. *Halley*, 902 F.3d at 1144.

For a right to be "clearly established," its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016). A plaintiff "typically must identify 'an on-point Supreme Court or published Tenth Circuit decision,' but also may look to the 'weight of authority' from other courts." *Harris*, 838 F. App'x at 342. The clearly established right must be "particularized to the facts of the case" and should not be defined "at a high level of generality," *id*., especially in the excessive force context, *City of Escondido v. Emmons*, 139 S.Ct. 500, 503 (2019). However, a case directly on point is not required so long as existing precedent has placed the statutory or constitutional question beyond debate. *A.N. v. Syling*, 928 F.3d 1191, 1197 (10th Cir. 2019). A general statement of the law can establish a right for qualified immunity purposes if it applies with obvious clarity to the specific conduct in question. *Ramirez v. Reddish*, No. 18-cv-00176-DME, 2020 WL 1955366, at *4 (D. Utah April 23, 2020). "A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Courts have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

## III.   The Objective Reasonableness Standard

"The Fourth Amendment's touchstone is reasonableness in the totality of the circumstances." *Armijo v. Peterson*, 601 F.3d 1065, 1071 (10th Cir. 2010). Government action is

measured in light of the totality of the circumstances and determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest. *U.S. v. Knights*, 534 U.S. 112, 118-19 (2001). The standard also applies to the manner in which the intrusion, such as a search, is conducted. *U.S. v. Banks*, 540 U.S. 3, 35 (2003).

Reasonableness is measured objectively. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify the action.'" *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (emphasis in original). The officer's subjective understanding or intent is irrelevant. *Id*. Consequently, this Court considers whether the Stipulation supports any potential justification for the warrantless entry and search of Plaintiffs' apartment regardless of Defendants' actual subjective motivation.

## ANALYSIS

Defendants did not enter the home with a search warrant. They contend that their warrantless entry nevertheless complies with the Fourth Amendment because it was reasonable under several exceptions to the warrant requirement. The above recitation of what happened leaves open the question of whether Defendants justifiably acted on the basis of any of the claimed exceptions. Consequently, the Court is unable to resolve that dispute in their favor on summary judgment. If a constitutional violation could be found, Defendants next argue that they did not violate clearly established law. Because Plaintiffs do not demonstrate how Defendants' actions violated a clearly established right, the Court finds Defendants entitled to qualified immunity.

I.       **Constitutional Violation**

In the prior dismissal ruling, this Court summarized the law regarding the constitutional

requirement for a warrant to enter a residence and conduct a search there:

> The Fourth Amendment generally requires a warrant for searches and seizures
> within a residence; otherwise, the search or seizure is presumptively unreasonable.
> *United States v. Mongold*, 528 F. App'x 944, 948 (10th Cir. 2013) (citing *Brigham
> City v. Stuart*, 547 U.S. 398, 403 (2006)). Unless an exception to the warrant
> requirement exists, warrantless entries are "unconstitutional even when a felony
> has been committed and there is probable cause to believe that incriminating
> evidence will be found within" the residence. *Id.* (quoting *Payton v. New York*, 445
> U.S. 573, 588 (1980)).

*Harris*, 2019 WL 6876870 at *5. "[T]he home is entitled to the greatest Fourth Amendment

protection." *U.S. v. Najar*, 451 F.3d 710, 713 (10th Cir. 2006). There are exceptions to the warrant

requirement. As the Court stated in the prior dismissal ruling:

> The presumption of unconstitutionality for warrantless searches may be overcome
> by "a few 'specifically established and well-delineated exceptions.'" *Doe v.
> Woodard*, 912 F.3d 1278, 1290 (10th Cir.), *cert. denied sub nom. I.B. v. Woodard*,
> 139 S. Ct. 2616, 204 L. Ed. 2d 265 (2019) (quoting *Roska ex rel. Roska v. Peterson*,
> 328 F.3d 1230, 1248 (10th Cir. 2003)). "These exceptions include (1) consent; (2)
> exigent circumstances; and (3) a 'special need.'" *Id.*

*Harris*, 2019 WL 6876870 at *5. A protective sweep is an additional possible exception at issue

here. Although they had no warrant, Defendants argue that one of the exceptions nonetheless

justifies their entry and search. The Court examines each exception in turn below.

A.       **Protective Sweep**

Defendants argue that their entry into the apartment was the kind of protective sweep that

*Maryland v. Buie* permits. ECF 136 at 16-19. "A 'protective sweep' is a quick and limited search

of a premises, that occurs in conjunction with an arrest, and for the purpose of protecting the safety

of police officers or others. *Maryland v. Buie*, 494 U.S. 325, 327 (1990). Consequently, if the arrest

takes place inside, then law enforcement may conduct the protective sweep without a search

warrant even though it entails going through the arrestee's residence. *Id*. However, as *Buie* expressly requires and subsequent Tenth Circuit case law reiterates, what is permissible is narrowly construed.

To begin with, a protective sweep is done as part of an arrest. *Buie*, 494 U.S. at 334; *U.S. v. Aguirre*, No. 16-CR-0027-CVE, 2016 WL 1464574, at n.4 (N.D. Okla. Apr. 14, 2016) (emphasizing how "[t]he Tenth Circuit has been clear that a protective sweep 'may take place only incident to an arrest"). "Unlike the majority of circuits that have held that a protective sweep can be performed upon any legal entry of a residence, the Tenth Circuit has held that a protective sweep is only permissible when it is performed as a search incident to an arrest." *U.S. v. Troxel*, 547 F. Supp. 2d 1190, 1200 (D. Kan. 2008) (citing *U.S. v. Torres-Castro*, 470 F.3d 992, 997 (10th Cir. 2006)). A protective sweep also may be permitted in other contexts if otherwise objectively reasonable such as under exigent circumstances. *Aguirre*, 2016 WL 1464574 at *13 (discussing *Kentucky v. King*, 563 U.S. 452 (2011)). For purposes of this section, the Court considers only a *Buie* protective sweep made incidental to an arrest. As for the other forms of a protective sweep, this Court discusses them separately in the exigent circumstances section.

The scope of the sweep is restricted. It is not a full search of the home, but rather a cursory visual inspection for persons who might pose a threat. Moreover, its spatial range is limited to the immediate vicinity of the arrest from which an attack could be launched. *U.S. v. Bagley*, 877 F.3d 1151, 1153-54 (10th Cir. 2017) (citing *Buie*, 494 U.S. at 334)). "The justification for permitting a suspicionless search of 'spaces immediately adjoining the place of arrest' is the danger inherent in taking a person into custody in the home." *Hobbs*, 2020 WL 7056102 at *7 (citing *Buie*, 494 U.S. at 333-34). It follows that a protective sweep is not justifiable if the arrest occurs *outside* the

confines of a home where there is no such concern. *Bagley*, 877 F.3d at 1154 (citing *U.S. v. White*, 748 F.3d 507, 510 (3d Cir. 2014)).

There are circumstances when a *Buie* protective sweep may exceed the boundaries of the arrest and encompass the rest of the house. However, for law enforcement to expand the range of the protective sweep, there must be articulable specific facts to support a reasonable, objective belief that someone dangerous lurks elsewhere in the house. *Bagley*, 877 F.3d at 1153-54 (citing *Buie*, 494 U.S. at 334). The absence of information about whether someone dangerous is present— that is, the mere possibility of danger or not knowing whether anyone else is around—does not justify a sweep. *Id.* (citing *U.S. v. Nelson*, 868 F.3d 885 (10th Cir. 2017)). There is no automatic protective sweep by simple virtue of entry into a home or an arrest of a resident. *Tunnell v. Gill*, No. 14-3206-DDC-KGS, 2018 WL 4154130, at *8 (D. Kan. Aug. 30, 2018) (citing *U.S. v. Carter*, 360 F.3d 1235, 1242-43 (10th Cir. 2004)). In other words, the sweep may not be limited to the purely precautionary purpose of determining whether a threat even exists in the first place.

On this record, Defendants cannot justify their entry into the Plaintiffs' residence on the basis of a *Buie* protective sweep. First and foremost, Defendants may have entered the apartment "on the heels of [Harris's] arrest," (ECF 136 at 18), but their sweep was not made *incidental* to it. Instead, the arrest took place *outside*, across the alley outside a neighbor's door. By comparison, the plaintiff in *U.S. v. Jones*, No. 18-CR-0128-CVE, 2018 WL 4635031, at *2 (N.D. Okla. 2018), was taken into custody after he had emerged from his house while police waited at the entrance after breaking the front door down. Even if Harris was arrested *near* his apartment, the setting did not raise the kind of safety concerns that would outweigh the privacy interests that Plaintiffs had in their home. In other words, Defendants did not conduct the protective sweep incidental to Harris's arrest.

The circumstances of his arrest created little actual concern of a safety threat emanating from his apartment to justify its sweep. The apartment itself was not intertwined with the reason for his arrest. Harris was arrested in the City of Aurora on a warrant for suspected involvement in a shooting that occurred a significant distance away in the City of Denver, in a potential crime that did not involve his apartment. Citing *White*, 185 F. Supp. 3d at 1314, Defendants deny needing to know with certainty that someone else is inside or take at face value an arrestee's assurances, but the shortcoming here is that Defendants express at most a vague suspicion. Defendants emphasize Harris's "proclivity to be armed and dangerous, the gravity of the underlying crime, [and his] past entanglements in other serious criminal activities," (ECF 136 at 17), but if Harris, himself, was a potential threat, that safety risk was neutralized upon taking him into custody. Defendants add that Harris was alone when he was arrested (*id*.), but that does not necessarily mean other dangerous persons were inside the apartment. The only other persons associated with the apartment were N.C. (who was known to be inside) and his mother, Cabral (who was known to have left). Even if Sgt. Barnes may have suspected or believed that someone else may have been inside, Defendants provide little argument to demonstrate how such a belief was reasonable. It is equally possible that there was no real reason to suspect the presence of anyone else at all, much less someone dangerous. Defendants' conduct was not necessarily consistent with the subjective belief that someone else was inside. They waited on DPD to clarify whether a search warrant was being obtained before entering, not on a specific and immediate safety concern. Defendants' reason for barring Cabral's entry into the apartment was not out of concern her for personal safety (that some other person inside might put at risk) but rather to await the search warrant.

Contrary to Defendants' assertion, the "constellation of known factors" as presented in the Stipulation does not "demonstrate[] a quintessential 'protective sweep.'" *Id*. at 17-18. To the extent

Defendants argue that their sweep of the apartment after arresting Harris was done simply to hold the premises until a search warrant was obtained (rather than to mitigate any immediate safety threats), the Court considers that argument under the exigent circumstances section below. To the extent Defendants argue they merely were acting on the request of another agency, the Court considers that argument under the reliance section below.

## B.      Exigent Circumstances

Additional reasons Defendants give for entering the apartment were to retrieve N.C. and to secure the apartment while DPD awaited a search warrant. ECF 136 at 23. The Court considers the reasonableness of those two reasons as subsets of the "exigent circumstances" exception. In the prior dismissal ruling, this Court summarized the law regarding this exception to the warrant requirement:

> "The exigent circumstances exception allows a warrantless search when an emergency leaves police insufficient time to seek a warrant. It permits, for instance, the warrantless entry of private property when there is a need to provide urgent aid to those inside, when police are in hot pursuit of a fleeing suspect, and when police fear the imminent destruction of evidence." *Birchfield v. North Dakota*, —— U.S. –——, 136 S. Ct. 2160, 2173, 195 L. Ed. 2d 560 (2016) (citation omitted). "Warrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) (quotations omitted) (brackets omitted).

*Harris*, 2019 WL 6876870 at *5-6 (citing *Woodard*, 912 F.3d at 1291 n.14).

## 1.      Emergency Aid

The need for law enforcement to render aid in an emergency situation is a type of "exigent circumstance" that—assuming there was a reasonable basis to do so—may permit entry into a home without a warrant. This exception applies when there is significant risk to the safety of a police officer or another. It derives from law enforcement's community caretaking function, a

responsibility which is categorically distinct from crime investigation. *U.S. v. Porter*, 594 F.3d 1251, 1255 (10th Cir. 2010); *U.S. v. Bradley*, 321 F.3d 1212, 1214 (9th Cir. 2003). *See also Franco*, 2021 WL 857601 at *13-14 (discussing community caretaking functions in the context of seizing a person).

To justify a warrantless entry into and search of a home on this basis, the police must have a reasonable basis to believe there is an immediate, urgent need to protect the lives or safety of themselves or others. It is an objective test guided by the realities of the situation, as presented by the record, and considered from the viewpoint of a prudent, cautious, and trained officer. Officers are not required to wait until they have absolute certainty or even probable cause of a personal safety emergency, but they still must have a plausible reason to act. *Najar*, 451 F.3d at 717-19. See also *Armijo*, 601 F.3d at 1070; *Porter*, 594 F.3d at 1258; *Cortez*, 478 F.3d at 1123-24; *Aguirre*, 2016 WL 1464574 at *10.

While N.C. was only nineteen months old and presumably alone in the apartment, that situation does not necessarily constitute an emergency or even an urgency *per se*. Nor at the time did Defendants act as if it were. They did not enter the home immediately upon learning that N.C. was alone inside but rather on DPD's instruction. In the previous dismissal Order, this Court did not find the allegations that Plaintiffs' "nineteen-month-old child was alone inside the apartment" and "Defendants knew . . . that no one was inside the apartment who could harm the child, and that his mother [already] had arrived on the scene before [their entry]," accepting them as true, "support[ed] any 'urgency' necessary to invoke the exigent circumstances." *Harris*, 2019 WL 6876870 at *6. The Stipulation before the Court now does not paint a substantially different picture or show a greater urgency to act, other than generalized assertions for suspecting the presence of someone else inside.

That is not to minimize the legitimate concern of a nineteenth-month-old child left alone in the apartment. Presumably all those at the scene shared in that concern, including Harris himself who was asking for help. The situation could meet the definition of an exigent circumstance even in the absence of some other medical or safety urgency, as recognized in *Bradley*, 321 F.3d at 1214-15 and *Jones v. State*, 54 N.E.3d 1033 (Ind. Ct. App. 2016). Unlike in those cases, N.C. was not alone in the middle of the night. Nevertheless, even if that distinguishing circumstance is ignored, Defendants did not limit how they retrieved the child similarly to *Bradley* and *Jones*. They did not explore other ways of handling the situation; nor upon entry did they restrict their activities to finding and retrieving N.C. only. Instead, they did the sweep in conjunction with N.C.'s retrieval and continued it after N.C. was removed from the apartment. Consequently, even if Defendants could meet the first required element of an emergency aid entry, they do not meet the second: limiting the scope of the intrusion to the minimum necessary to redress the exigency. *U.S. v. Hendrix*, 664 F.3d 1334, 1338 (10th Cir. 2011); *U.S. v. Aquino*, 836 F.2d 1268, 1272 (10th Cir. 1988); *U.S. v. Warthen*, No. 13-CR-95-CVE, 2013 WL 3353609, at *3 (N.D. Okla. July 3, 2013).

### 2.      Safety

Defendants concede that the exigency was not for fear that N.C. was in imminent harm on his own. Rather, the urgency they saw came from not knowing whether somebody else was inside the home who could pose a danger to the child. ECF 144 at 11. Law enforcement officers may conduct a warrantless search if there is a risk of serious physical injury to them or others that requires swift action. To justify a warrantless entry into a home on this basis, Defendants must show: (1) an objectively reasonable basis to believe that there was an immediate need to enter to ensure safety and (2) they carried out that entry in a reasonable manner. *Hobbs*, 2020 WL 7056102 at *6 (citing Tenth Circuit case law). However, it remains an open question on this record whether

Defendants had a plausible basis for believing that anyone else was inside (besides N.C.) much less someone who posed a danger to N.C. They speculate that Harris would not have left N.C. alone without adult supervision, but the circumstances do not necessarily bear that out. If Harris had intended on visiting his neighbor for only a brief period, and if he knew that Cabral soon would return (as she in fact did), it would be understandable for him to leave N.C. unattended. It seems less likely that Harris would have left N.C. alone with a dangerous person, as Defendants suggest. Nor was there a reasonable fear that one or more persons were inside the apartment who posed an immediate danger to law enforcement (who were all outside) to justify entering the home to conduct a protective sweep.

Defendants rely on *U.S. v. Spates*, No. 16-CR-50004, 2018 U.S. Dist. LEXIS 79974 (N.D. Ill. May 11, 2018), *aff'd on other grounds*, 777 F. App'x 826 (7th Cir. 2019), but it is distinguishable. Police arrested Spates just outside his home on an outstanding arrest warrant, although there were responding to a report of gunfire coming from inside his apartment. The police found a spent shell casing on him but no gun. Spates said a six-year-old child was inside the apartment. Police were concerned about the possibility that either a loaded gun or the shooter (if not Spates) remained inside with the child. After the officers' attempt to communicate with the child through the door proved unsuccessful, they entered the home, looked for the child, and brought him out. The court found the entry justifiable. Thus, the police in *Spates* were responding to a potentially dangerous situation in which both the arrestee and the dwelling were related, and to a situation for which there was a specific concern about a young child's well-being. Moreover, the police entered only after less intrusive measures were unsuccessful. Although "the officers went from room to room and looked in any place where a person could [hide]," *Spates*, 2018 U.S. Dist. LEXIS 79974, at *4, the ruling leaves unclear whether they conducted the kind of protective

sweep that Defendants employed in Plaintiffs' apartment, or rather if they limited the scope of their actions only to what was necessary to locate and remove the child.

### 3.    Potential Destruction of Evidence and Securing the Apartment

Law enforcement may "seize" a dwelling until a search warrant can be obtained. Doing so requires probable cause of the need to prevent the destruction of evidence. *Segura v. U.S.*, 468 U.S. 796 (1984); *Tunnell*, 2018 WL 4154130 at *9. A home may be secured for that purpose either from within, as in *Segura*, where officers already were inside the home and prevented the occupants' unfettered movement, or from the outside by preventing a resident from entering his own home unaccompanied, *Illinois v. McArthur*, 531 U.S. 326 (2001) (applying *Segura*). The seizure of a home also requires law enforcement to act diligently in obtaining a search warrant; the interference must be of a temporary duration. *McArthur*, 531 U.S. at 332-33. The act of securing a residence and restricting the activity of residents has been found to constitute an exigent circumstance in investigations of drug operations, for example, where the evidence—such as drugs—can be destroyed easily. *U.S. v. Martinez*, 191 F. App'x 856 (11th Cir. 2006); *U.S. v. Ruiz-Estrada*, 312 F.3d 398 (8th Cir. 2002).

The Tenth Circuit strictly defines when police may enter a home without a warrant to secure evidence. There must be clear evidence of probable cause, involving a serious crime, the likely destruction of evidence, supported by well-defined indicators of exigency, and not subject to police manipulation or abuse. Moreover, the intrusion must be limited in scope to the minimum necessary to prevent the destruction of the evidence. *Aguirre*, 2016 WL 1464574 at *11 (citing Tenth Circuit case law). *See also Porter*, 594 F.3d at 1255; *Cortez*, 478 F.3d at 1124.

The Stipulation leaves speculative whether there was evidence inside the apartment at risk of being destroyed. The crime for which Harris was arrested was not intertwined with the

apartment. There was no concrete concern about evidence related to the crime at risk of being destroyed (or even a specific, real possibility that someone else remained inside who could have destroyed any such evidence). Even if those were the circumstances, neither did Defendants secure the apartment in the least invasive manner. Rather than post a guard outside, as was found acceptable in *U.S. v. Harris*, 102 F. Supp. 3d 1187 (D. Kan. 2015), they entered the home and performed a sweep.

Cabral does not argue that Defendants violated her Fourth Amendment rights when they prevented her entry into her home. For purposes of this discussion, the Court assumes that Defendants could have secured the dwelling from the outside and kept anyone (including Cabral) from entering until the search warrant was obtained. If there was no reasonable belief that others already were inside (either as potential threats to safety to officers or N.C. or who could have destroyed evidence of a crime), there was no justifiable reason to enter the apartment and secure it from within.

Of course, Defendants did not face a straight-forward situation of temporarily securing a property. They could not simply contain the residence and prevent anyone from entering it because a toddler was there, presumably alone. Defendants emphasize that they were not going to leave N.C. alone inside while DPD awaited a search warrant (ECF 144 at 11), which obviously was a legitimate concern. Even if there was no other reason that independently justified entering the apartment, there was at least the practical need to remove N.C. and place him in his mother's care. Because Defendants would not let Cabral retrieve N.C. alone by herself, they decided to enter the home to do it themselves, and "with their entry they would have swept the home." ECF 144 at 10. The flaw in Defendants' contention is that it suggests the protective sweep may have been simply an automatic feature of their entry.

27

Theoretically, there may have been a way to accomplish the goal of removing N.C. in a way less intrusive than a sweep of the entire home, but the Stipulation does not suggest that any lesser approach was tried, or even considered. The Stipulation leaves open the possibility that Defendants instead may have executed the protective sweep that they already had planned before DPD was able to apprehend Harris outside the dwelling after his unanticipated exit to visit a neighbor. The case law cited above does not suggest that police may conduct a "protective sweep" (even if limited to the purpose of ensuring that no others were present and not to search for evidence) as a matter of routine as a function of entering a dwelling. The extent to which Defendants feared the presence of others inside the apartment is unclear, but the above-cited case law holds that the concern must have been legitimate and objectively reasonable.

Even though they articulate no concrete reason for affirmatively believing that others (beyond N.C.) were inside the apartment, Defendants argue that their protective sweep—conducted after arresting Harris outside the home, for the purpose of securing the property while DPD awaited a search warrant, and in conjunction with N.C.'s retrieval—still was constitutional. In support, they rely on *U.S. v. Jones*, No. 18-CR-0128-CVE, 2018 WL 4635031 (N.D. Okla. 2018). ECF 144 at 12. In that case, there was an outstanding fugitive arrest warrant on felony charges for Jones (and another, Santagata). They surveilled a house where Jones and Santagata were believed to be located. Santagata was observed leaving the house with her sister, and she was arrested elsewhere. Police believed Jones remained inside. They entered the house's garage, performed a protective sweep of it, but later decided to arrest Jones at the front door instead. Although they broke the door down, they did not actually enter the house to arrest him; instead, Jones came out to them. During the course of that interaction, police smelled strong marijuana odors, and on that basis, they began the process of obtaining a search warrant. While they waited

on it, they "conducted a protective sweep to clear the residence of any persons or threats to officer safety." *Id*. at *3. The three officers who testified at the suppression hearing denied any specific reason to believe that anyone else remained inside or that there were weapons in the house. Neither could they rule out for sure that no one else was present. *Id*. at *3-4. The court denied the arrestees' motions to suppress, finding the protective sweep permissible under *Buie*. *Id*. at *7. The court noted how the officers "did not know whether there was anyone else in the residence other than Jones at that time" and [t]herefore . . . conducted the protective sweep to ensure there was no one hiding in the house that could pose a threat to officer safety while [they] were securing the residence pending the search warrant." *Id*. The court further noted how the sweep was limited in scope and duration. *Id*. However, the later execution of the search warrant did reveal substantial evidence of drug trafficking.

Plaintiffs describe the action of the officers in the *Jones* case as being "engaged in a standard protective sweep of the home." ECF 141 at 13. Similar to Plaintiffs' situation, it appears that the officers entered Jones' house *not* on the basis of a specific safety concern but rather as a precautionary measure to ensure that the house was empty while they awaited a search warrant. Jones appealed his conviction on other grounds, arguing "that the evidence [did] not support a finding that he possessed the 9mm pistol 'in furtherance of' his drug crimes" and that the sentence imposed was substantively unreasonable. *U.S. v. Jones*, 802 F. App'x 325, 327 (10th Cir. 2020). The Tenth Circuit noted Jones' arrest "at his new house" and the search which "turned up more drugs," *id*. at 326, but it does not appear that Jones appealed the denial of his motion to suppress. The Tenth Circuit affirmed his conviction and sentence.

Plaintiffs unsuccessfully attempt to distinguish *Jones*. (ECF 141 at 13-14). It is true that the arrest of Jones occurred in a proximity (just outside the front door) that was closer to the

dwelling than that of Mr. Harris (outside the neighbor's front door). Nevertheless, Jones' arrest still did not involve the interior confines that justify a protective sweep incidental to an in-house arrest. Plaintiffs further that Defendants lacked "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene," but *Jones* does not suggest the officers at that house had such an affirmative belief either.

*Jones* appears to extend the reach of a *Buie* protective sweep so that it could apply to the situation in this case. Moreover, it is a decision from within the Tenth Circuit that was made a year *after* the sweep of Plaintiffs' home. It provides the greatest support for Defendants' position, but it alone does not outweigh the cases that Plaintiffs cite (ECF 141 at 20-21) requiring a substantive reason for conducting a protective sweep. In *U.S. v. Garza*, 125 F. App'x 927, 931 (10th Cir. 2005), the Tenth Circuit emphasized how a *Buie* protective sweep (in addition to being limited to an arrest situation, a requirement which this Court discusses separately above), requires law enforcement to have an objectively reasonable belief that the space to be searched contains a person who poses a danger to either the officers or others. *Garza* found unreasonable the officers' search of a motel bathroom even though they had reason to suspect unlawful drug activity and actually knew a man was inside the bathroom who had slammed the bathroom door shut and refused to communicate with them. In *U.S. v. Hauk*, 412 F.3d 1179, 1186 (10th Cir. 2005), the Tenth Circuit described *Buie*'s requirement for articulable facts as "essentially the same [as the] 'reasonable suspicion' standard that justifies [a *Terry* stop]." *Hauk* furthered that "the Fourth Amendment does not sanction automatic searches of an arrestee's home, nor does the fact-intensive question of reasonable suspicion accommodate a policy of automatic protective sweeps." *Id*.

The Stipulation leaves debatable whether Defendants had a "reasonable suspicion" that the apartment harbored someone who posed a danger. In the absence of such an articulable concern, the evidence suggests that Defendants may have conducted the protective sweep as an automatic component of securing the apartment and removing N.C. That is not what *Garza* and *Hauk*, as well as *Hobbs* and *Tunnell* discussed above, require. Those cases outweigh *Jones* and suggest that Defendants conducted their full protective sweep with insufficient justification. As a result, a factfinder could find that Defendants violated Plaintiffs' Fourth Amendment constitutional right.

### C.      Reliance

Defendants emphasize that they were acting at DPD's explicit request (ECF 144 at 10-12) and relied in good faith on their representations (*id*. at 15). They "served only to assist in the containment, if necessary." *Id*. If Defendants mean that they merely were following DPD's instructions, they cite no case law to demonstrate how mere passive compliance with another agency's request is a meritorious defense.

Defendants contend that DPD "had access to much more information, including the basis to request the sweep as well as the basis to request a warrant." ECF 144 at 15. Therefore, "Defendants reasonably relied in good faith on the requests and representations made by Defendant officers." *Id*. However, Defendants do not explain what information DPD (or another APD officer) had, but they lacked, that excuses their warrantless entry and sweep. They emphasize how they had "arrived on scene shortly before Harris was arrested" (*id*.), but why that fact is material to this issue is unclear. Next, they contend that DPD alone made the decision to conduct a *Segura*-based containment of the apartment. *Id*. at 16. However, they point to no information known by DPD of an objectively reasonable need to prevent the destruction of evidence. More broadly, Defendants

identify no flawed conclusions reached by the DPD officers or some set of more accurate information that would have caused them to act differently had they known it.

Whether it was information known by Defendants or some other officers (either fellow APD officers on scene or the DPD), neither party explains how it materially affects the analysis of whether Defendants' entry and protective sweep are supported by an objectively reasonable basis. Plaintiffs try to raise a dispute of fact over whether Defendants knew DPD actually had or at least intended to obtain a search warrant. However, Plaintiffs do not show that Defendants entered the apartment to execute the *arrest* warrant. The record seems clear that Defendants knew Harris was not inside. Plaintiffs further that Defendants actually did or should have known that Cabral already had returned (or very quickly would return) before they entered the apartment, but regardless of what Defendants personally understood about that particular circumstance, the outcome is the same. A reasonable jury could find a Fourth Amendment violation.

### D.    Consent

Harris could have consented to Defendants' entry, thereby obviating the need for a search warrant or other justification. Defendants argue that Harris "gave at least an 'implied consent' to enter his home and, therefore, an implied consent to 'search.'" To be valid, "[t]here must be clear and positive testimony that consent was unequivocal and specific and freely given," and "[t]he government must prove consent was given without duress or coercion, express or implied." *U.S. v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007); *see also Warthen*, 2013 WL 3353609 at *4 (citing Tenth Circuit case law). To satisfy the first requirement for voluntariness, the consent must be clearly expressed, "but it need not be verbal. Instead, consent may be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *Guerrero*, 472 F.3d at 789-90. Whether consent was given is determined objectively

under the totality of the circumstances and asks if a reasonable officer would infer consent from the person's words, gesture, or other conduct. *U.S. v. Lopez-Carillo*, 536 F. App'x 762, 768 (10th Cir. 2013).

Defendants do not go so far as to demonstrate what facts show Harris's objective expression of consent. Presumably, Defendants are relying on the exchange recited above at Stipulation No. 19 in which Harris informs Officer Jenkins of N.C. Because the exchange consists of Harris's oral expressions of concern about N.C., the basis of Defendants' implied consent argument is unclear. Defendants' argument does not seem to depend on gestures or other non-verbal communications. Nevertheless, the evidence leaves open the question of whether Harris unequivocally and specifically consented to Defendants' entry into his apartment to retrieve N.C. The Court does not find Defendants entitled to summary judgment on a consent-based justification.

## II.    Cleary Established Law

Plaintiffs make a strong argument for denying summary judgment in Defendants' favor on the question of whether a Fourth Amendment right violation occurred. If Defendants did sweep Plaintiffs' home improperly, that alone is not enough to overcome Defendants' invocation of qualified immunity. Plaintiffs must show more than a violation of a Fourth Amendment constitutional right. They also must demonstrate how Defendants at the time should have known their action was constitutionally infirm; in other words, that the right Defendants violated when they entered the house and conducted the protective sweep was "clearly established" for their benefit.

The focus of both parties' arguments is on whether a constitutional violation occurred. Neither addresses to the same extent the second question of whether a clearly established right is at issue. Ultimately, Plaintiffs bear the burden of persuasion, but they rely on the conclusory

argument that "Defendants' entry of [their] home violated clearly established law under the Constitution" (ECF 141 at 23), and that "[a] reasonable jury could find that all of the Defendants violated [their] clearly established Fourth Amendment rights" (*id*. at 25). Presumably, the "right" at issue is the requirement for a justifiable reason to enter and search a private residence without a warrant, but Plaintiffs provide no separate, specific argument to define what was "clearly established" in the context of this case. Nor do Plaintiffs cite any Tenth Circuit case law to support their position.

The summary judgment motion's briefing does not make it otherwise obvious that a "clearly established" right is at issue. Strictly applying the governing Tenth Circuit case law, the factfinder could find a constitutional violation on the facts presented. However, a "clearly established" determination does not necessarily follow therefrom.

No Supreme Court or Tenth Circuit case supplies the basis for a finding of clearly established law here. Even the above-cited decisions by district courts within the Tenth Circuit made in the context of a Section 1983 civil lawsuit that are close factually go both ways. In *Tunnell*, the court entered summary judgment in the plaintiff's favor after finding that law enforcement had an insufficient reason to check whether others were present or to fear the destruction of evidence to justify their protective sweep. *Tunnell*, 2018 WL 4154130 at *7-9. While the court found a constitutional violation, it did not address the additional "clearly established" element of a qualified immunity defense. *Hobbs* did consider that aspect, finding that the protective sweep— which was done with neither exigent circumstances nor articulable facts to believe the presence of someone who posed a danger—to constitute a violation of clearly established constitutional rights. *Hobbs*, 2020 WL 7056102 at *9. However, the case of *U.S. v. Jones*, No. 18-CR-0128-CVE, 2018 WL 4635031 (N.D. Okla. 2018), *aff'd on other grounds*, 802 F. App'x 325, 327 (10th Cir. 2020),

found no constitutional defect with the "standard" protective sweep at issue there. To the extent the above district court cases relate to the clearly established law determination, they point in different directions.

None of those three decisions were available to give Defendants guidance because all were rendered later. However, they do illustrate how very fact-specific the determination can be, especially in the instant situation where "the facts," as Defendants stress, "may not fit neatly into particularized legal constructs." *Id*. at 22. In other words, the circumstances as the Stipulation presents them show that Defendants' action do not fall squarely within any of the relevant exceptions. Defendants were presented with a situation which blended together aspects of a permissible warrantless entry and search, combining an arrest, securing property for a later search, and the presence of a child (presumably alone) inside. How Defendants should have proceeded may not have been clear. In neither *Tunnell*, *Hobbs*, or *Jones* was there the additional complicating factor of the need to removal a toddler from the home as was necessary in this case.

Whether Defendants' actions went so far as to violate clearly established law is a close question. "[A] case on point isn't required if the impropriety of the defendant's challenged conduct is clear from existing case law." *Kerns v. Bader*, 663 F.3d 1173, 1186 (10th Cir. 2011). Plaintiffs make a strong argument for finding a constitutional violation, but they fall short—on the unique circumstances presented here—of meeting the more demanding "clearly established law" burden. Plaintiffs do not cite a controlling case or show a robust consensus of cases that squarely govern the totality of the circumstances that would have informed Defendants that their entry and sweep in Plaintiffs' apartment on August 17, 2017 was unconstitutional. In other words, the cases to which Plaintiffs cite do not put the constitutional question concerning Defendants' particular conduct beyond debate, a test for determining whether the right at issue was clearly established,

*Brandt v. Crone*, No. 19-cv-03103-MEH, 2021 WL 681441, at *5 (citing *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018)).

<u>**CONCLUSION**</u>

Defendants raise a variety of exceptions to justify their entry and sweep of Plaintiffs' home, but the circumstances, as presented in the Stipulation, leave room for a reasonable jury to reject each one. Consequently, this Court cannot enter summary judgment in their favor that no Fourth Amendment violation occurred. Tenth Circuit case law draws the relevant exceptions narrowly, and the present situation does not fall neatly within the definition of any. While Plaintiffs may make a strong argument for finding a Fourth Amendment violation, they cannot demonstrate that Defendants' actions were contrary to clearly established law. Even if the exceptions themselves are well-defined, Defendants faced a complicated situation for which the case law offered no clear guidance at the time (and for which there still is no consensus). As a result, Plaintiffs do not overcome Defendants' claim of qualified immunity protection.

Because qualified immunity protects the remaining Defendants from Plaintiffs' remaining claim for relief, the Court **grants** Defendants' Motion for Summary Judgment [<u>filed June 4, 2021;</u> <u>ECF 136</u>]. The Clerk of Court shall enter final judgment in Defendants' favor and close this case.

Entered this 8th day of December, 2021, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge